**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KAREN CELESTINO-HORSEMAN**
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**CYNTHIA G. HARMON**
Flora, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE PATERNITY OF A.C-F.,          )
                                        )
J.F.,                                   )
                                        )
    Appellant-Respondent,              )
                                        )
       vs.                      )    No. 08A02-1405-JP-315
                                        )
T.C.,                                   )
                                        )
    Appellee-Petitioner.               )

APPEAL FROM THE CARROLL CIRCUIT COURT
The Honorable Benjamin A. Diener, Judge
Cause No. 08C01-1212-JP-52

**December 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

J.F. ("Mother") appeals the award of primary physical custody of A.C-F. ("Child") to T.C. ("Father"). She presents two issues for our review, which we revise and restate as follows:

1. Whether the trial court's August 19, 2013, order was a provisional or final order.

2. Whether the trial court abused its discretion in awarding primary physical custody to Father.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

Child was born in 2009, and Mother filed a petition to establish paternity on December 20, 2012. In the interim, Child lived with Mother, and Father exercised informal parenting time. After completing a DNA test, Father admitted paternity, and the Court entered a Judgment of Paternity on June 24, 2013. In its judgment, the Court awarded Mother temporary custody of Child and ordered that Father have parenting time pursuant to the Indiana Parenting Time Guidelines. Because Father indicated his desire to have primary physical custody of Child, the court appointed a guardian ad litem ("GAL") and set the matter for hearing regarding permanent support and custody on August 19.

Despite being unable to observe Father interact with Child, the GAL filed her first report on August 12.[1] In that report, the GAL indicated a number of concerns she had regarding Mother's care of Child:

---

[1] The GAL attributed this deficiency in her report to "confusion between the parties and me" and "time and distance constraints." Appellant's App. at 43. However, because of the GAL's "remaining

2

[Child], age 4 years and 3 months as of this writing, is not toilet-trained. . . . And there is no physical or developmental reason why he is not. . . . Dad finds it extremely disturbing that [Child] is still in diapers . . . . Mom doesn't find it disturbing and explains that [Child] fights against toilet-training. She states that he will urinate in the toilet with some regularity but will not use the toilet for bowel movements. I asked what the plan was, given that he should be starting school in one year. [Mother] stated that she thought he would be more likely to go along with toilet-training once he knew he was going to school because he was looking forward to that.

I was curious as to what [the daycare provider] had to say about [Child], so I dropped by her home/day care for a visit. [She] stated that she had been watching [Child] for less than a year but that his development had really come a long way in that time. . . .

Closely related to the issue of toilet-training is the matter of discipline. [Father] expressed concern about [Child's] tendency to react to the word "no" with a tantrum or a meltdown.

When I visited with [Mother] and [Child] in [Mother's] home, [Child] did, indeed, lurch from one tantrum to another. . . . [H]is behavior would have been more appropriate to a child two years younger. In the hour that I was there, [Child] threw a full-blown tantrum over being refused a soda (yelling, throwing things); he burst into screaming when his video game ended and his mother did not reset it quickly enough for his liking; he pushed his mother (physically) at least three different times because he didn't want her to talk to me. He refused to talk to, look at, or acknowledge me, although he did salute my exit with a "Bronx cheer."[2]

To her credit, [Mother] acted more or less appropriately in that she did refuse to give in to his tantrums. I don't know if her refusal was for my benefit or if she routinely refuses to reward tantrums, although the fact that he kept at it for the better part of the hour suggests that he is accustomed to some sort of payoff for his trouble. In any event, [Mother] did not lose her temper, which is good, but she also did not escalate her response to include

---

observations of [Child] with his various family members," the GAL stated that she did "not believe that it is likely that an observation of [Child] with his father [would be] likely to alter [her] recommendations." Id.

2 A "Bronx cheer" is also known as a "raspberry": "a sound of contempt or derision made by trilling the extended tongue between the protruded lips." Webster's Third New International Dictionary of the English Language Unabridged 282, 1883(Merriam-Webster, Inc. ed., 1961).

a timeout or loss of privileges, which might have been warranted at some point.

The [Child] I observed at . . . day care was an entirely different child.  He was shy, but he answered [the care provider] politely when she spoke to him, responded to redirection, played with—or at least alongside—other children peacefully, and smiled.  [The daycare provider] stated that he was never a behavior problem; that he was still learning social skills, especially sharing, but that he did not hit or push the other children; and that she never had to put him in timeout.

\* \* \*

[Mother] believes that, outside of the diaper issue, "he's way ahead of where he needs to be."

From the little bit of speech I overheard at [Mother's] and [at the daycare], I am concerned that his social skills, vocabulary, and diction are below average for a child of his age, but[,] again, I could not coax much speech out of him.  Although he generally stayed in the same room as [Mother] and me, he refused to make eye contact or even look at me.  At day care, he was standing in a corner by himself when I arrived, apparently on his own initiative . . . , but[,] after 10 minutes or so[,] he grabbed a toy truck and joined some other little boys.  He smiled at [his care provider] when she spoke to him and talked a little in response to her direct questions.

\* \* \*

[Father] states that the best place for [Child], ultimately, is with [Mother].  However, he believes he is in the best position to bring [Child] up to speed—or as close as possible—in the year remaining before he begins school.  He and [his fiancée ("Fiancée")] will be sending [their daughter] to a nearby Catholic Kindergarten and would like to enroll [Child] at the Preschool there. . . .  [Father] believes he is more of a disciplinarian than [Mother] is, and [Fiancée] states that although [Child] gives her a little bit harder time than he does [Father], she can get him to listen. . . .

[Mother] believes that things are going fine with [Child], that [Child] is largely "way ahead of where he should be," and that [Father] is largely motivated by a desire to avoid paying child support. . . .

> [Child] is well behind where he should be in terms of behavior, toilet-training, and social skills. There is no known or suspected physical or mental reason for the delay. . . . I believe that, as much as he has benefitted from being at [day care], he would benefit more from the more structured environment of a preschool.
>
> . . . Given that [Child] is more than one year behind—after months of playing catch-up—this problem did not arise solely under [Mother's] watch. And [Mother] has made a number of good choices regarding [Child's] welfare and development. She went to a great deal of effort to select a good day[-]care provider, and I cannot say enough good things about [that provider]. . . . Her dedication is impressive and has apparently paid off in terms of improving his development.
>
> However, . . . [Mother] does not believe there is a problem and[,] therefore[,] is ill-equipped to address it. The fact is that [Father] sees the problem and has articulated a specific plan for addressing it.

Appellant's App. at 3-7 (comma splices omitted). The GAL concluded with a recommendation that Father receive immediate primary physical custody to toilet-train Child and prepare him for preschool. But at the conclusion of the school year, the GAL recommended that Mother then receive primary physical custody of Child. Both parents were to have parenting time under the respective recommendations.

Before the August 19 hearing, the GAL had a conversation with Mother that prompted the GAL to change her recommendations. The GAL testified:

> [Mother] is making efforts to toilet train [Child] . . . with some mixed success. . . . [B]ut she seems optimistic and she seems determined, which is nice. . . . [A]nd she has also picked out a preschool for him, which would meet five days a week, close to the sitter that he currently uses . . . . [A]nd given that she has a little bit more of [a] plan at this point, . . . I'd be more inclined to recommend that [Child] stay with her. . . . [B]ut the custody change was originally always meant just to be temporary anyway. I was never comfortable with just a temporary custody change if both parents have a plan . . . . [I]f both parents have . . . what sounds like an adequate plan, I prefer to leave the child[] where he is, in the circumstances he's accustom[ed] to.

*  *  *

I think given the way this case has gone with the concerns that have been raised, I think it's . . . probably a good idea no matter who gets custody to come back in three months or so . . . and see how the child is doing. How he's progressed. What issues he's facing at that point.

Aug. 19 Tr. at 17-19.[3]

At the conclusion of the August 19 hearing, the trial court continued custody with Mother and entered an order to that effect. This order is best explained in the context of the court's statements in open court. The court stated:

I don't like the idea of a temporary custodian. Because these kids need parent permanency. . . . [S]o dad if you're going to go for custody, I want you to go for custody.

*  *  *

If you feel that mom isn't going to get the job done[,] . . . then you need to come in here and tell me, I want to be this child's custodial parent from today until we pack the bags for college when they are eighteen or [sign up for military] service or they move out and get married and start a family. . . . [T]he idea that we're going [to] go to some kind of a nine month potty[-]training summer camp, . . . that might work . . . [b]ut . . . it's going to impact the child . . . negatively to go from place to the other place then back to the other place. . . . [S]o what I feel like is . . . I want to make decisions that at least at the time that we're making them, look like [they're] permanent. . . . [N]ow that doesn't mean it couldn't change. You know . . . , these orders are always subject to change. One thing they don't want us Judges doing is popping these kids back and forth every year. . . . [I]t's hard on the kids. It makes it impossible for the parents . . . . [P]otty training, it's a big deal. . . . [B]ut . . . frankly what concerns the Court more than potty training is the idea that we[']re raising an undisciplined child. . . . I mean you're not supposed to be off the hook. Which it sounds like what your child is. Crazy, running around off the hook. . . . [N]ot teaching your child to control himself is something that . . . will affect every part of that

---

[3] For reasons we cannot fathom, the transcripts for the July 24 and August 19, 2013, hearings are bound in a single volume containing far fewer than 250 pages, but the volume is not consecutively paginated. More bewildering still, the transcripts for the hearings held on March 4 and April 11, 2014, are bound in a separate volume, which is labeled "Volume I of II," that is consecutively paginated. To avoid confusion, we cite to the transcript by the month, day, and page number.

child's life. . . .  I'm going to lean towards stability, but if we come back in three months and it's not a lot better and dad says I'm in this for the long haul not just for the rest of the school year, then we're going to make a change.

* * *

[S]o let's come back sometime between Thanksgiving and Christmas.  You can always come back sooner if things start to go really bad or go off the rails. . . .  In the meantime work together.  Get a plan.  And then[,] if you can[,] update your [GAL] report . . . .

* * *

And . . . I would like to hear, either through the guardian ad litem . . . or in person from the daycare person.  Probably through the guardian ad litem would be alright.

* * *

Or preschool.  You know what I'm saying.

* * *

So they can say . . . here's where we were when we started, here's where we are now, these are the pros[,] the cons, . . . we've made progress, we haven't made progress.  That kind of thing. . . .  [I]t's not just the potty training[;] it's the discipline.  That'll let me know whether we're going to continue down path A or path B.

Id. at 19-21, 25-26 (emphases added).

Following the August 19 hearing, the court scheduled a review hearing for November 18, which, after several continuances, was held on April 11, 2014.[4]  In the

---

[4]  Also, pursuant to a restructuring, the case was transferred from the Carroll Superior Court to the Carroll Circuit Court.

interim, Child's preschool and daycare submitted reports to the court. Also, the GAL moved for a psychological evaluation of Child, which was granted.[5]

The preschool's report, dated November 13, 2013, indicated that Child had struggled with daily routine and discipline, and it compared him to a "newborn baby" who cries when he does not get his way. Id. at 52 (quotation marks omitted). Further, the report noted that Child had "come a long way in [two] months but lacks in social [and] self[-]help skills." Id. at 56. In this regard, the report detailed daily meltdowns and incidents where Child had smacked or spit at adults who had directed him. In stark contrast, however, the daycare provider's report, dated November 3, described Child as "a very smart boy" who "is polite and a joy to be around." Id. at 59. Both reports expressed that Child had mastered potty training.

The GAL filed her updated report on February 24, 2014. In relevant part, it described:

> On November 12, 2013,[6] I dropped in on [Child] at his preschool . . . and spoke with . . . the head teacher. [The teacher] described [Child] as "a handful" and noted that "[h]e doesn't like rules." . . . [W]hen [Child] doesn't get his way, he has a meltdown, and these meltdowns happen often.
>
> I observed [Child] with his classmates and noted that he did not play with other children. . . . A little girl attempted to engage [Child]. He ignored her for a while, and then he screamed two or three times and then hit her [o]n the head. He did not speak to her or any of the adults present. [His teacher] stated that this was typical behavior for [Child]. He does not

---

[5] The court ordered the parents to obtain the psychological evaluation within forty-five days of a November 21, 2013, order. When the court finally received reports from two different providers in February 2014, it discovered that the evaluation still had not occurred. Thus, in a review hearing held on March 4, the court admonished the parties for their failure to comply with its order, granted a continuance requested by Mother, and set the matter for further hearing on April 11.

[6] This visit was the basis for the GAL's motion for a psychological evaluation.

engage in anything resembling conversation, although he is capable of speaking.

While I was there, the other children hung up their coats and backpacks with minimal assistance from the adults and then went to playtime. [Child] remained behind, either unwilling or unable to comply, for at least 10 minutes, while [his teacher] explained repeatedly what was expected of him. Eventually, with assistance by [his teacher], [Child] hung up his coat and pack and joined his classmates in the playroom. [His teacher] stated that [Child's] unwillingness or inability to take care of himself was also typical.

[His teacher] also has numerous concerns regarding Mom.

- . . . The children are frequently sent home with papers to work on with their parents or things to show their parents. [Child's] folder inevitably returns untouched.

- [Child] misses preschool an average of one day per week. [His teacher] does not know why.

- One day in the previous week, mom failed to pick [Child] up at school at 2:30. The school does not have a phone number for mom because she purportedly will not give them one. . . . The preschool did have a number for the babysitter, . . . so they called her, and she took him. At 5:30, [the babysitter] still couldn't reach mom, so she fed [Child] dinner. At about 6:30, the police were called because she was still unable to reach mom. Mom arrived shortly afterward to pick up [Child]. Mom . . . told both the preschool and me that she had lain down for a nap and had not woken up. She gave the preschool conflicting stories about why she had not heard her phone . . . .

- While [Child's teacher] and I were discussing [Child's] behavior issues, [his teacher] stated, "I'd rather deal with [Child] than with [Mother]."

* * *

[Mother] appears to have difficulty providing [Child] with a stable routine. . . . [Child's] absence rate of approximately 20 percent does not bode well for kindergarten next year. Her failure to monitor his progress through the papers provided in his folder is concerning. I am also concerned about [Mother's] failure to provide the preschool with a direct

9

contact number for her and for her failure to pick [Child] up on at least one occasion for several hours beyond the pickup time. . . .

[Mother] also appears to have continuing difficulty identifying or accepting that [Child's] behavior is unusual. . . .

[Father], of course, presents his own issues. He admits that he resorted to hitting his older children with a belt for disciplinary reasons on 7 or 8 occasions. Quite frankly, [Child] is a difficult child, and a parent who is inclined to resort to beatings is likely to beat [Child]. When I last spoke with [Father] in November, he stated that he understood that this form of discipline is inappropriate, but I have no idea how deeply that understanding has taken root, nor what sort of strategy he has for replacing beating the child with a belt.

. . . I am very troubled by [Mother's] inability to understand or admit to [Child's] problems[,] as well as her inability to provide [Child] with the consistency he needs in terms of both preschool attendance and feedback. A person can't address a problem she can't or won't see. [Father] does have the advantage of acknowledging that there is, in fact, a problem. If [Father] is willing and able to work with a therapist to devise and follow a plan for dealing with [Child's] behavior, [Father] may be able to provide more of the structure and stability that [Child] needs. However, I am reluctant to make any concrete recommendations at this point while the psychological evaluation is still pending.

Appellant's App. at 70-73 (comma splices omitted). The GAL made no recommendations at that time.

The GAL filed one final report on March 3, 2014, based on reports received by Raj Clinic and Christiansen Counseling Services regarding the ordered psychological evaluation of Child.[7] The GAL's report reiterated her concerns, with the following pertinent elaboration:

The second thing that stood out about Dr. Christiansen's report came on page 3 of her report. . . . [S]he describes [Child's] tantrums in disturbing detail. She then notes that "[t]hese trantrums appeared to be more intense and last longer when his mother was present than when he

_____

[7] As noted earlier, neither provider had performed the evaluation at that time, but both did conduct counseling services.

10

was in session by himself." I have not seen [Child] with his mother since my visit in August, but[,] of the three places I have observed [Child] (his day care, his preschool, and his mother's home), his behavior at his mother's was by far and away the worst.

* * *

Unfortunately, Dr. Christiansen did not have an opportunity to observe [Child] with his father. (Nor, for that matter, did I.) This is another unfortunate hole in the reports. I am not entirely clear on why [Father] was not included in the evaluations or counseling. I think we would have a fuller picture of [Child's] behavior if he had been included.

* * *

. . . I have been disappointed in the lack of consistency I have seen at [Mother's] . . . ; and I am troubled by the fact that Dr. Christiansen observed, as I did, that [Child's] behavior is markedly worse when [Mother] is present.

[Child] needs stability, first and foremost. For that reason, I am reluctant to advocate changing custody lightly. . . . I wish that Dr. Christiansen had had an opportunity to observe [Child] with [Father]. I wish I had. But more than anything else, I hate to give any additional reason for delay. [Child] needs help, and he needs consistency, and he needs it as soon as possible.

[Father], as was noted at an earlier hearing, has a history of physical discipline that is troubling, particularly given [Child's] specific needs. It is my understanding that he is willing to work on learning new disciplinary techniques. . . .

Given all of the unknowns with regard to [Child]—the full extent and nature of his behavioral problems, the extent to which those problems are displayed when he is with [Father], the ability and willingness of both [Mother] and [Father] to adapt their child rearing techniques to provide the sort of environment that [Child] needs—I am not as confident in my recommendations as I would like to be. However, I am comfortable in asserting that [Child] needs assistance as quickly as possible.

Id. at 83-84. The GAL recommended that Father be awarded primary custody.

Pursuant to the court's order, Child was ultimately evaluated by a psychologist at

The Otis R. Bowen Center for Human Services, Inc. The psychologist assessed Child

11

and his interactions with Father and issued a report on March 26. The report affirmed that Child does not function on the autism spectrum but diagnosed him with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct. It did not indicate the presence of tantrums during the evaluation. The GAL testified that, from this, she inferred that Child either did not throw tantrums in Father's presence or that any such tantrums were less severe than those present when Child was with Mother.

The court held its final review hearing on April 11, and it accepted an updated report from Christiansen Counseling Services that same day. That report indicated that, while Child continued to have some behavioral problems, including meltdowns, he had markedly improved during the month-long period that he participated in counseling services. Christiansen recommended further evaluation; continued counseling, including family counseling with participation from Mother and Father; and "a structured environment with consistent expectations and consequences." Id. at 98. The GAL did not change her recommendations based on this report, citing Child's seemingly-more-severe tantrums when with Mother.

Following the hearing, on that same day, the court entered an "Order Modifying Custody and Support."[8] It found that modification was in the best interests of Child and that a substantial change in one or more of the factors under Indiana Code Section 31-14-13-6 supported modification. As a result, the court awarded primary custody to Father. This appeal ensued.

---

[8] The parties apparently did not request, and the court did not enter, specific written findings under Trial Rule 52(A).

## DISCUSSION AND DECISION

Mother presents a two-fold argument: First, she contends that the August 19, 2013, order by the court constituted a final—not provisional—order, which awarded mother primary physical custody. Second, she asserts that the court abused its discretion when it awarded custody to Father for three reasons: (1) Father did not move for a custody modification; (2) Child markedly improved while in Mother's care and, therefore, any changed circumstances supported a primary custody placement with Mother; and (3) Child's best interests are promoted by primary custody with Mother.

Initially, we hold that the court entered a provisional order on August 19. As a result, the subsequent award of primary physical custody of Child to Father only needed to be in Child's best interests. Thus, we need not address the first or second parts of Mother's second argument.

### Issue One:  Provisional or Final Order

"[A] provisional order is designed to maintain the status quo of the parties." Mosley v. Mosley, 906 N.E.2d 928, 929 (Ind. Ct. App. 2009). In contrast, a final order "disposes of all claims as to all parties." Ind. Appellate Rule 2(H)(1). Thus, a provisional order, temporary in nature, terminates when the final order is entered. See Ind. Code § 31-15-4-14 (2014); Mosley, 906 N.E.2d at 930. It merges with, and is extinguished by, the final order. See Mosser v. Mosser, 729 N.E.2d 197, 200 n. 3 (Ind. Ct. App. 2000).

This issue matters here because it affects the standard that the trial court must have applied in awarding physical custody to Father on April 11. If the court entered a

13

provisional order on August 19, it later needed to find only that primary physical custody with Father was in the child's best interests. See Seifert v. Porter (In re Seifert), 605 N.E.2d 1202, 1206 (Ind. Ct. App. 1993). Conversely, if the trial court entered a final order on August 19 that awarded Mother primary physical custody but then modified custody on April 11, it needed to find both that primary physical custody with Father was in Child's best interests and that a substantial change in circumstances under Indiana Code Section 31-14-13-6 had occurred. See id.

Here, the context in which the trial court entered its August 19 order indicates that the court intended to issue a provisional order. Its statements from the hearing held on that date demonstrate that the court sought to maintain the status quo for Child, which would provide him with stability throughout the course of litigation, and not to enter a final custody determination.

Father and the GAL offered the court a temporary plan for custody that would have required the child to move back and forth between Mother and Father's homes several times during a short period in order to prepare the child for kindergarten. The court, however, declined this type of temporary custody because it believed that a "nine month potty-training summer camp" would negatively "impact the child" by forcing him "to go from place to the other place then back to the other place." Aug. 19 Tr. at 19. Thus, the court sought to enter an order that "look[ed] like it's permanent" for Child and avoided "popping [Child] back and forth every year." Id. at 20.

On August 19, therefore, the court "lean[ed] towards stability" for Child but, most importantly, kept the case on its active docket for further review and stressed that its

order was subject to change.  <u>Id.</u> at 21.  In this regard, it requested new and updated reports to gauge Child's progress, which would inform the court "whether we're going to continue down path A or path B."  <u>Id.</u> at 26.  And the court instructed Father, that if he wanted custody, to tell the court he wished to permanently parent Child, and it informed the parties that it would "make a change" if Child's situation and behavior did not improve in the interim.  <u>Id.</u> at 21.  Accordingly, we hold that the trial court entered a provisional order on August 19.  As a result, irrespective of the title and structure of the court's April 11 order, the court was only required to find that primary custody with Father was in Child's best interests.

### Issue Two:  Best Interests

"Upon finding that a man is the child's biological father, the court shall, in the initial determination, conduct a hearing to determine the issues of support, custody, and parenting time."  I.C. § 31-14-10-1 (2014).  "The court shall determine custody in accordance with the best interests of the child.  In determining the child's best interests, there is not a presumption favoring either parent."  I.C. § 31-14-13-2 (2014).  The relevant factors bearing on the best interests include:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:
    (A) the child's parents;
    (B) the child's siblings; and
    (C) any other person who may significantly affect the child's best interest.

15

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Id.

As we stated in K.W. v. B.J. (In re M.W.), 949 N.E.2d 839, 842-43 (Ind. Ct. App. 2011):

> A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor and hears their testimony. Thus, on review, we will not reweigh the evidence, judge the credibility of witnesses or substitute our judgment for that of the trial court. We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom.
>
> * * *
>
> Where, as here, a trial court is making an initial custody determination, it is required to consider all evidence from the time of child's birth in determining the custody arrangement that would be in the best interest of child.

The trial court found that an award of primary physical custody of Child to Father was in Child's best interests, and Mother's arguments amount to a request for this court to reweigh the evidence. Indeed, Mother contends simply that Child improved while still in Mother's care and that the GAL's report was systemically dubious due to the GAL's failure to observe Father with Child and to the GAL's reliance on purportedly stale evidence. However, the trial court heard all of the evidence and judged its credibility. That evidence included reports that indicated improvement in Child's behavior, but the

16

court nevertheless concluded that Child's interests would be best promoted with Father. This decision is supported by the GAL's reports and testimony, both of which repeatedly expressed concern with Mother's ability to provide stability and to discipline Child. The GAL's concerns were corroborated by Child's preschool teacher, who described Child's uncompleted work and erratic attendance. And the GAL recounted that, in stark contrast with the concerns of the court, Father, the preschool provider, and Child's counselors, Mother did not see any issues with Child's behavior.

Further, even if Child did improve while Mother had temporary primary physical custody, the court could have concluded from the evidence that this improvement occurred because of Child's enrollment in preschool, the care provided to Child by his daycare provider, and Child's participation in counseling services. In fact, the evidence showed that Child's behavior was at its worst when he was in Mother's care. Thus, we defer to the trial court's discretion, which is supported by the evidence, and we hold that the court did not abuse its discretion when it awarded primary custody to Father.

Affirmed.

BAILEY, J., and PYLE, J., concur.